PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TPA RISK MANAGEMENT, LLC, | ) | |
| | ) | CASE NO. 4:24CV0161 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| BUCKEYE DEALERSHIP CONSULTING, LLC, *etc.*, | ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant. | ) | [Resolving ECF Nos. 36 and 44] |

Pending is Defendant Buckeye Dealership Consulting, LLC d/b/a Specialty Administration Services' Motion for Summary Judgment (ECF No. 36). Defendant moves the Court for judgment as a matter of law against Plaintiff on all of its claims because the parties did not form a binding term contract. Also pending is Plaintiff TPA Risk Management LLC's Motion for Partial Summary Judgment (ECF No. 44). Plaintiff moves the Court for summary judgment, in whole or in part, on (1) Counts I, II and IV of the Complaint (ECF No. 1); (2) Defendant's accord and satisfaction defense (Answer and Counterclaim (ECF No. 10 at PageID #: 101, ¶ 4); and (3) the Counterclaims (ECF No. 10). The Court has been advised, having reviewed the record, the parties' briefs, and the applicable law. For the reasons that follow, the Court finds the 2023 Agreement (ECF No. 36-6) is an enforceable contract. Therefore, the Court grants Plaintiff's motion in part and denies Defendant's motion.

## I. Stipulated Facts

The stipulated facts[1] are as follows:

1. In the fall of 2020, Defendant first retained Plaintiff to assist in reviewing Defendant's vehicle warranty claims.

2. On or about September 4, 2020, the parties executed an agreement relating to Plaintiff's consulting services ("2020 Agreement").

3. A true and accurate copy of the 2020 Agreement was marked as Deposition Exhibit 4 (marked first during the deposition of Robert Fox, Sr.). *See* ECF No. 38-4.

4. The initial term of the 2020 Agreement was September 4, 2020 to December 31, 2020, but the parties extended the term into early 2021.

5. The 2020 Agreement provided for a fixed monthly payment of $8,500 plus reasonable expenses.

6. In or around September 2022, Defendant retained Plaintiff to perform an audit of Defendant's claims process ("Audit Agreement").

7. The parties agreed that Plaintiff would be paid a flat fee of $9,750 for the audit of Defendant's claims process.

8. A true and accurate copy of the Audit Agreement was marked as Deposition Exhibit 6 (marked first during the deposition of Robert Fox, Sr.). *See* ECF No. 38-6.

9. According to Rob Fox, Defendant's Chief Executive Officer, the audit showed that Defendant's claims process was "sloppy."

---

[1] *See* Stipulation of Uncontested Facts (ECF No. 37).

10. In mid-October 2022, the parties executed another agreement ("2022 Agreement").

11. A true and accurate copy of the 2022 Agreement was marked as Deposition Exhibit 14 (marked first during the deposition of Robert Fox, Sr.). *See* ECF No. 38-14.

12. Under the 2022 Agreement, Plaintiff agreed to perform certain services, and Defendant agreed to share 50% of the claims severity savings with Plaintiff.

13. The term "claims severity" refers to the amount paid per claim.

14. The 2022 Agreement stated that the term of the agreement was four years; however, the agreement mistakenly stated that the term would run from "October 15th, 2022, to October 31st, 2022" – a period of just 16 days.

15. In early January 2023, the parties executed an agreement that corrected the date range for the term of the agreement ("2023 Agreement"). *See* ECF No. 36-6.

16. The 2023 Agreement provided that Defendant would share 50% of the claims severity savings with Plaintiff.

17. The 2023 Agreement added the following: "The actual average cost will be agreed upon by both parties by December 1, 2022 and will be included as an addendum to this agreement." ECF No. 36-6 at PageID #: 294.

18. In the fall of 2023, Plaintiff sent Defendant a calculation for the amount that Plaintiff claimed was due under the 2023 Agreement, and Defendant disputed that Plaintiff was entitled to this amount.

19. On or about November 7, 2023, Vinny Miller and Justin Thompson (representatives of Plaintiff) and A.J. Johnson and Jacob Jeswald (representatives of Defendant) participated in a Microsoft Teams call.

20. During the November 7, 2023 Teams call, the parties were unable to agree on the amount owed to Plaintiff.

21. On November 8, 2023, Vinny Miller emailed Rob Fox and stated in part:

> I cannot spend any more time trying to fight for what is owed to us for the value we brought your company. I am trying to take care of other customers like you and helping my 25-year-old son who is fighting for his life with stage 4 cancer. I know that it may not be important to you, but it is VERY important to me. Just pay me what you think we are owed so we can catch up on the 14 months' worth of work we have provided to [Specialty Administration Services]. Let me know when to expect our past due funds.[2]

ECF No. 36-7 at PageID #: 298-99.

22. On November 20, 2023, Defendant sent a letter to Plaintiff via email. *See* ECF No. 36-8.

23. The letter informed Plaintiff that Defendant was terminating the relationship and that Defendant intended to transmit $435,231.26 as payment for what Defendant owed Plaintiff.

24. Defendant authorized the payment of $435,231.26 to Plaintiff, and this payment was received by Plaintiff.

---

[2] The parties stipulate to the accuracy of the above-quoted language, but reserve the right to object at trial to the admissibility of certain aspects of this language.

## II. Background

Plaintiff is a third-party claims administrator of vehicle service contracts. Its webpage advertises Plaintiff as a "consulting services company, providing advisory services and solutions for organizations currently doing business in the Vehicle Service Contract (VSC) Industry." It claims that Plaintiff can "minimize risk exposure, improve claims, handling procedures and . . . provide technical and procedural training." ECF No. 36-1. Buckeye Dealership Consulting, LLC ("Buckeye") operates in the "buy here/pay here" ("BHPH") sector of the automobile dealership community, providing services such as vehicle service contracts, warranties, and other ancillary products that a consumer may want to protect the car. *See* Deposition of Robert R. Fox, Sr. (ECF No. 38-1) at 14:20-15:2. Buckeye has established itself in the BHPH marketplace and has experienced significant growth over the last six years. *See* ECF No. 38-1 at 14:9-12. Specialty Administration Services ("SAS") is a division of Buckeye that primarily administers lender coverage on medium and heavy-duty trucks. *See* ECF No. 38-1 at 17:18-20; 18:23-19:1-3. In 2022, Defendant retained Plaintiff to assist in reducing its average claims severity, *i.e.*, the average amount paid per claim.[3]

---

[3] During Plaintiff's audit of Defendant (which occurred just before the parties executed the 2022 Agreement (ECF No. 38-14)), Plaintiff identified numerous claims that were problematic. Rob Fox was furious about the issues identified during the audit:

> A. . . . We paid a heavy-duty claim off a picture of a medium-duty transmission.
>
> Q. Uh-huh.
>
> A. That just set me on fire.

ECF No. 38-1 at 58:4-8.

In the year leading up to the 2022 Agreement (ECF No. 38-14), Defendant's average claims severity was $2,629.13. Declaration of Vinh Miller (ECF No. 48-1) at PageID #: 1090, ¶ 24. After the parties executed the 2022 Agreement (ECF No. 38-14), Plaintiff, among other things, trained and monitored Defendant's adjusters and provided feedback; assisted Defendant in searching for new adjusters; provided a claims checklist to assist in processing claims; reviewed larger claims and made recommendations; and, identified potential vendors that could reduce Defendant's costs. ECF No. 48-1 at PageID #: 1090, ¶ 25. Based on Plaintiff's efforts, Defendant's average claims severity dropped to $1,978.45 during the time that Plaintiff worked for Defendant. ECF No. 48-1 at PageID #: 1090, ¶ 26. And Defendant was aware of these savings. ECF No. 48-1 at PageID #: 1091, ¶ 33.

The 2023 Agreement (ECF No. 36-6) differed from the 2022 Agreement (ECF No. 38-14) as it (1) corrected the scrivener's error pertaining to the term and (2) required the parties to agree upon an addendum with the "actual average cost" per claim for the previous year. *See* ECF No. 36-6 at PageID #: 294. The addendum was proposed by Plaintiff because Defendant did not have reliable claims data to calculate the baseline severity for October 1, 2021 – October 1, 2022. *See* ECF No. 48-1 at PageID #: 1088, ¶ 8. In sending the 2023 Agreement (ECF No. 36-6) to Fox, Miller explained: "As for now, I don't have a good base to give you as our 12 months average claim severity until [Stone Eagle] provide the true data. We can just *add that as an amendment* to this *contract*." Email from Miller to Fox dated Nov. 8, 2022 (ECF No. 38-16); *see also* Doc. 38-1 at 87:2-88:1. In his deposition, Fox confirmed that the parties were "waiting on accurate data regarding claim severity to determine the average cost for October 1, 2021

through October 1, 2022." ECF No. 38-1 at 95:22-96:2. An addendum to the 2023 Agreement (ECF No. 36-6) was necessary because the parties had not agreed on the actual average cost of claims and that calculation was required to calculate claims severity savings. That would allow the parties to determine Defendant's savings which resulted from Plaintiff's services.

According to Defendant, the addendum language in the 2023 Agreement, *see* ECF No. 36-6 at PageID #: 294 evidenced that the parties needed to do more before there could be a true meeting of the minds. *See* ECF No. 38-1 at 94:17-21. Defendant argues an agreed upon true "actual average cost" calculation for claims severity constituted a material term of the 2023 Agreement (ECF No. 36-6). Vinny Miller, Plaintiff's Owner and President, admitted as much during cross-examination at his deposition:

> Q Now, you agree with me that the actual average cost would be a material term to this agreement?
>
> * * *
>
> A Yeah. You -- you got to have the true base.

Deposition of Vinny Miller (ECF No. 42-1) at 83:4-8. Defendant also contends the Tables in the 2022 and 2023 Agreements (ECF Nos. 38-14 and 36-6) were included for example purposes only. *See* ECF No. 38-1 at 81:3-6; 82:14-18; Deposition of Justin Thompson (ECF No. 46-1) at 45:4-9.

The addendum contemplated by the parties was never signed because an agreement was not reached pertaining to the data that was to be included in the calculation of the baseline average cost and there was never an agreement as to whether the base would be "reset" annually on a move forward basis. *See* ECF No. 42-1 at 74:14-75:16. The failure to agree upon a true

base meant that the parties could not calculate how Plaintiff's fees would be calculated for the first year of the term.

The parties also failed to agree on how the savings would be calculated throughout the term in the 2023 Agreement (ECF No. 36-6) and were never able to agree on the methodology for such a calculation. Fox and Miller could neither agree on the addendum nor the schedule for payments on a go-forward basis. Miller testified during cross-examination at his deposition:

> Q Also -- back to the agreement --would you agree that there was not a schedule by which savings [were] calculated on an annual basis?
>
> * * *
>
> THE WITNESS: There was not a schedule? Yes, I agree.
> That's why we couldn't -- we didn't have the data to calculate. That's why we're here.

ECF No. 42-1 at 83:11-19. The lack of concurrence to this material term was confirmed by Fox on behalf of Defendant. He testified during cross-examination at his deposition:

> Q. Okay. And so if you thought that [Plaintiff] did great work, why did it terminate the relationship?
> A. Go back to the missing schedule, and then you looked at how Vinny did the calculation on a go-forward basis. It wasn't year over year. His calculation would have been gone back to the first year every year. . . .

ECF No. 38-1 at 127:16-23.

During the Teams call, Plaintiff listened to the suggestions Defendant made as to how the savings should be calculated. Miller described part of the discussion as follows:

> A We said: "Okay. After removing the auto out of there, we want just the trucks. Now, we can come up with the calculation. Here's the calculation."

Excerpt of Deposition of Vinny Miller (ECF No. 47-1) at 89:12-14. The deposition of A.J. Johnson (representative of Defendant) is further evidence that in November 2023 the parties were

still far apart as to the proper methodology for the calculation. Johnson, whom participated in the Microsoft Teams call, testified during cross-examination:

> Q. . . . It sounds like you're saying there are certain circumstances where 50 percent might be fair. I'm just trying to understand what the circumstances are that would dictate whether it's fair or not. Can you provide some additional information on that?
> A. Depending on how the losses were calculated --
> Q. Right.
> A. -- and what was included in those calculations.
> Q. Right. And is it fair to say that you would think it's not fair to include claims that are from the Canadian book of business, right?
> A. Yes.
> Q. And you don't think it was fair to include North Mill, right?
> A. Right.
> Q. Okay. Is there anything else that you think would need to be excluded from the calculation for the 50 percent other than those two items I just mentioned?
> A. Denied claims.

Deposition of Antony J. Johnson (ECF No. 43-1) at 46:9-47:8. These exclusions, however, are not referenced in either the 2022 Agreement (ECF No. 38-14) or the 2023 Agreement (ECF No. 36-6). And Plaintiff's procedures helped Defendant save money by identifying fraudulent or otherwise deficient claims. *See* ECF No. 48-1 at PageID #: 1089, ¶ 18. Plaintiff argues it saved Defendant "thousands upon thousands of dollars" by helping Defendant identify invalid claims. ECF No. 48-1 at PageID #: 1089, ¶ 19. But according to Defendant, it need not share those savings. In his deposition, Rob Fox claimed (for the first time) that he wanted the addendum to state that the baseline would reset every year – meaning the claims severity for year one would be the baseline for year two, the claims severity for year two would be the baseline for year three, *etc.* *See* ECF No. 36 at PageID #: 254 (citing ECF No. 38-1 at 127:16-23). In this scenario, however, Plaintiff was concerned it would make little or nothing in years 2-4 of the contract.

(4:24CV0161)

Ultimately, Miller was upset with Defendant's proposed methodology for calculating savings and told Defendant's representatives on the Teams call that ". . . he did not want to work for [Defendant] anymore if we were not going to pay him what he wanted. . . ." Deposition of Jacob R. Jeswald, CPA (ECF No. 39-1) at 36:21-22.

On November 20, 2023, Shaun K. Petersen, Defendant's Executive Vice President & Chief Legal Officer, sent a letter to Miller via email. *See* ECF No. 36-8. It provides, in relevant part:

> Our team has analyzed all pertinent facts and has established the sum total of what is owed [Plaintiff] to be four hundred seventy-five thousand, two hundred [thirty-one] dollars and twenty six cents ($475,231.26). . . . As you know, SAS transmitted twenty thousand dollars ($20,000) to [Plaintiff] in September 2023 and transmitted an additional twenty thousand ($20,000) to [Plaintiff] in October 2023. The remaining amount of four hundred thirty-five thousand, two hundred [thirty-one] dollars and twenty six cents ($435,231.26) will be transmitted Wednesday. . . . With this letter, SAS formally notifies [Plaintiff] that its services are no longer required.

The letter, however, does not condition payment on release of all claims or instruct Plaintiff to return the funds if it is unwilling to release its claims. Defendant later paid this remaining amount via an automated clearing house ("ACH") transfer (not with a check). *See* Quickbooks Spreadsheet of Defendant's Payments to Plaintiff (ECF No. 38-5 at PageID #: 387); ECF No. 39-1 at 12:1-13:7. It is undisputed that Defendant paid Plaintiff $475,231.26 for the savings generated between October 2022 and September 2023. *See* ECF No. 48-1 at PageID #: 1090, ¶ 23. But Plaintiff continued working until November 2023. *See* ECF No. 48-1 at PageID #: 1091, ¶ 36. According to Plaintiff: (1) Defendant incorrectly calculated the amount owed by excluding North Mill and Canadian claims and claims that were denied (the "Disputed Claims"),

*see* ECF No. 48-1 at PageID #: 1089, ¶ 20; (2) the September 2023 data was incomplete when Defendant performed its calculation, *see* Declaration of Vinh Miller (ECF No. 41-1) at PageID #: 638, ¶ 18, resulting in an underpayment to Plaintiff for September 2023; and (3) no payment for October or November 2023.

On December 1, 2023, Plaintiff sent an email requesting access to Defendant's database to continue performing work. In response, Defendant referred to the November 20, 2023 letter. *See* Emails between Johnson and Thompson dated Dec. 1, 2023 (ECF No. 43-34). Shortly thereafter, Plaintiff retained counsel and sent a letter demanding payment of the amount due under the parties' agreement. *See* ECF No. 41-1 at PageID #: 639, ¶ 29.

On January 26, 2024, Plaintiff filed a seven-count Complaint (ECF No. 1) invoking the Court's diversity subject-matter jurisdiction. Count I is for declaratory relief (1) that the 2023 Agreement (ECF No. 36-6) is a valid, enforceable contract, or, alternatively, the 2022 Agreement (ECF No. 38-14) is a valid, enforceable contract; (2) providing the Baseline Average Cost; and (3) providing the amount owed under the 2023 Agreement (ECF No. 36-6), or, alternatively, the 2022 Agreement (ECF No. 38-14). Count II is for breach of contract (2023 Agreement (ECF No. 36-6)). Count III is for breach of contract (implied covenant of good faith) (2023 Agreement (ECF No. 36-6)). Count IV is for breach of contract/reformation (2022 Agreement (ECF No. 38-14)) (pled in the alternative). Count V is for breach of contract (implied covenant of good faith/reformation (2022 Agreement (ECF No. 38-14)) (pled in the alternative). Count VI is for unjust enrichment/*quantum meruit* (pled in the alternative). Count VII is for promissory estoppel (pled in the alternative).

On April 22, 2024, Defendant filed an Answer and Counterclaim (ECF No. 10). In addition to its denials and affirmative defenses, Defendant asserts two counterclaims. Count I is for negligent misrepresentation. Count II is for breach of contract (pled in the alternative).

**III. Standard of Review**

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of genuine dispute. An opposing party may not simply rely on its pleadings. Rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in

the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. The existence of some mere factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Anderson*, 477 U.S. at 248. Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment. *Id.* This standard of review does not differ when reviewing cross-motions for summary judgment versus a motion filed by only one party. *United Food & Commercial Workers Union Local No. 17A v. Hudson Ins. Co.*, No. 5:11CV2495, 2012 WL 2343905, at *2 (N.D. Ohio June 20, 2012) (Pearson, J.).

## IV. Analysis

**A. Counts I and II – Declaratory Judgment and Breach of Contract (2023 Agreement (ECF No. 36-6)**

When parties do not dispute the facts, but dispute whether the facts give rise to a legal contract, "whether a contract exists is a mixed question of law and fact." *MTD Products Inc. v. Am. Honda Motor Co.*, 744 F. Supp.3d 812, 820 (N.D. Ohio 2024) (quoting *Storm v. Bureau of Prisons*, No. 4:08CV1690, 2009 WL 1163123, at *6 (N.D. Ohio April 29, 2009)). Summary judgment may be granted when "the material facts involved in the matter are undisputed and questions of law predominate." *Am. Signature, Inc. v. Extreme Linen, LLC*, No. 2:12-cv-00601, 2015 WL 1476751, at *15 (S.D. Ohio March 31, 2015) (citing *Univ. of Tenn. William F. Bowld Hosp. v. Wal-Mart Stores, Inc.*, 951 F.Supp. 724, 725-26 (W.D. Tenn. 1996)).

Under Ohio law, a successful breach of contract claimant must prove "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Alshaibani v. Litton Loan Servicing, LP*, 528 Fed.Appx. 462, 464 (6th Cir. 2013) (quoting *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio App. 2d Dist. 1994)). The essential elements of a contract include "an offer, acceptance, the manifestation of mutual assent, and consideration (the bargained for legal benefit or detriment)." *Res. Title Agency, Inc. v. Morreale Real Est. Servs., Inc.*, 314 F. Supp.2d 763, 769 (N.D. Ohio 2004) (citing *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002)). Contract interpretation is a question of law. *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000). And "[t]he intent of the parties is best determined by the plain language of the contract." *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003).

Defendant argues that the the 2023 Agreement (ECF No. 36-6) is unenforceable as a term contract. According to Defendant, without an agreement to the material term, *i.e.*, "actual average cost," the parties could not enter into an enforceable term contract. Defendant cites *General Motors Corp. v. Keener Motors, Inc.*, 194 F.2d 669 (6th Cir. 1952), in support of its argument. The Court of Appeals held there is no contract "[i]f the obligation to become binding rests on a future agreement to be reached by the parties, so that either party may refuse to agree." *Id.* at 676.

The 2023 Agreement provides, in relevant part: "The actual average cost will be agreed upon by both parties by December 1, 2022 and will be included as an addendum to this agreement." ECF No. 36-6 at PageID #: 294. By the time the parties signed the 2023 Agreement (ECF No. 36-6) on January 10, 2023, this December 1, 2022 cutoff date had already passed. Defendant, however, was not concerned at that time that the parties had not attached an addendum. Indeed, Defendant did not even raise the issue until 10 months later. The parties performed under the 2023 Agreement (ECF No. 36-6) until November 20, 2023.

It is undisputed that Plaintiff was entitled to 50% of the claims severity savings. *See* ECF No. 37 at PageID #: 302, ¶¶ 12 and 16. Even if the Court finds that the parties left open certain terms of the 2023 Agreement (ECF No. 36-6), Plaintiff argues the Court should still find that the agreement is enforceable. According to Plaintiff, the parties intended to be bound, so there is no reason for the Court to frustrate that intention. Plaintiff contends the trier of fact can fill any gaps in the agreement with reasonable terms. *See* *Oglebay Norton Co. v. Armco, Inc.*, 556 N.E.2d 515, 520 (Ohio 1990) ("If it is found that the parties intended to be bound, the court should not

(4:24CV0161)

frustrate this intention, if it is reasonably possible to fill in some gaps that the parties have left, and reach a fair and just result.”).

If there is some ambiguity in the compensation term of the 2023 Agreement (ECF No. 36-6) that Plaintiff was entitled to “50% of the claims severity savings,” the finder of fact should rely on the typical rules of contract construction to construe the term. *See Owusu v. Hope Cancer Ctr. of Northwest Ohio, Inc.*, No. 1-10-81, 2011 WL 3890516, at *4, ¶¶ 16-17 (Ohio App. 3rd Dist. Sept. 6, 2011) (construing the vague contract term “primary service area.”). If Plaintiff is right, then the Disputed Claims are included in the calculation. If Defendant is right, then the Disputed Claims are excluded. In both scenarios, the parties have an enforceable agreement. *See B.W. Rogers Co. v. Wells Bros., Inc.*, No. 17-11-25, 2012 WL 605519, at *10, ¶ 45 (Ohio App. 3rd Dist. Feb. 27, 2012) (“The lack of a specific definition for an ascertainable contract term does not negate the parties’ intention to form a contract at that time and it does not invalidate the contract.”) (citing *Owusu*, 2011 WL 3890516 at *4, ¶ 17).

**B. Count III – Breach of Contract (Implied Covenant of Good Faith) (2023 Agreement (ECF No. 36-6))**

According to Defendant, “[t]he 2023 Agreement [ ] supplanted the 2022 Agreement [ ] and specifically contained language requiring the parties to agree on the ‘actual average cost by December 1, 2022 by way of an addendum to the Agreement.’ ” ECF No. 36 at PageID #: 247. Ohio law recognizes a claim for negotiating in bad faith after agreeing to agree on a term. “An ‘agreement to agree’ on particular terms in the future implies that the parties will negotiate in good faith.” *Willow Park Convalescent Home, Inc. v. Crestmont Cleveland Partnership*, Nos. 81147, 81259, 2003 WL 132291, *8 ¶ 48 (Ohio App. 8th Dist. Jan. 16, 2003). When the parties’

conduct constitutes evidence of a binding contract, "it is a question of fact whether the parties had a binding agreement to agree. If the parties had such an agreement, that agreement implies a duty to negotiate in good faith." *Nephrology & Hypertension Specialists, LLC v. Fresenius Med. Care Holdings, Inc.*, No. 2:09-cv-781, 2010 WL 3069758, at *5 (S.D. Ohio Aug. 5, 2010). And "Ohio law allows recovery of damages for the breach of an agreement to agree[.]" *Id.* Therefore, there is a genuine issue of material fact regarding whether Defendant breached the duty of good faith by negotiating the "actual average cost" to be included as an addendum in bad faith. This necessitates a denial of Defendant's request for summary judgment on Count III.

**C. Count IV – Breach of Contract/Reformation (2022 Agreement (ECF No. 38-14)) – Pled in the Alternative**

For the Court to enforce the 2022 Agreement (ECF No. 38-14), the date range will need to be reformed. Therefore, Plaintiff requests that the Court correct the date range. Defendant agrees that the date range is a mutual mistake. *See* ECF No. 38-1 at 76:13-20. The Court could, if necessary, provide an equitable remedy and reform the 2022 Agreement (ECF No. 38-14) to reflect the parties' intent. *See, e.g.*, *Connor & Murphy, Ltd. v. Applewood Vill. Homeowners' Assn.*, No. CA2007-09-213, 2009 WL 806774, *3-4, ¶¶ 16-19 (Ohio App. 12th Dist. March 30, 2009).

**D. Count V – Breach of Contract (Implied Covenant of Good Faith/Reformation (2022 Agreement (ECF No. 38-14)) – Pled in the Alternative**

If the 2022 Agreement (ECF No. 38-14) is an agreement to agree, there is a genuine issue of material fact regarding whether Defendant breached the duty of good faith by negotiating in bad faith.

**E. Count VI – Unjust Enrichment/*Quantum Meruit* – Pled in the Alternative**

To prove unjust enrichment, a plaintiff must show "1) plaintiff conferred a benefit on defendant; 2) defendant knew of such benefit; 3) defendant retained the benefit under circumstances where it would be unjust to do so without payment." *Res. Title Agency, Inc. v. Morreale Real Est. Servs., Inc.*, 314 F. Supp. 2d 763, 771 (N.D. Ohio 2004). If Plaintiff's contract claims fail, then it may be able to recover on its equitable claims. Defendant's request for summary judgment on Count VI is denied without prejudice to reasserting the argument in a motion at trial.

**F. Count VII – Promissory Estoppel – Pled in the Alternative**

"The doctrine of promissory estoppel comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice." *Olympic Holding Co., L.L.C. v. ACE Ltd.*,909 N.E.2d 93, 96 ¶ 39 (Ohio 2009). Because it can only apply when the requisites of contract are not met, "[l]ike unjust enrichment, promissory estoppel is not an available remedy where the legal relationship of the parties is governed by a valid and enforceable contract." *RAM Constr. Servs. of Cleveland, LLC v. Key Constr., Inc.*, 624 F. Supp.3d 884, 897 (N.D. Ohio 2022) (quotation marks omitted). Defendant's request for summary judgment on Count VII is denied without prejudice to reasserting the argument in a motion at trial.

**G. Defendant's Accord and Satisfaction Defense**

As stated by an Ohio Court of Appeals:

> The defense of accord and satisfaction requires proof on three elements: (1) the plaintiff accepted the defendant's offer to resolve the plaintiff's claim; (2) the defendant satisfied its undertaking to the plaintiff; and (3) the offer and acceptance were supported by consideration. . . . However, acceptance of a partial

> payment alone does not raise a genuine issue as to accord and satisfaction. . . . There must be a bona fide dispute over a claim, and the debtor must tender the check upon the *express* condition that it shall be in full satisfaction of the disputed claim. . . .

*Bd. of Educ. Toronto City Sch. v. Am. Energy Utica, LLC*, 152 N.E.3d 378, 398-99 ¶ 67 (Ohio App. 7th Dist. 2020) ("*Toronto 1*") (emphasis in original). An accord and satisfaction requires "the parties have knowledge of facts which are material to the agreement." *Maine v. Leonard Truck & Trailer, Inc.*, No. 13 MA 156, 2014 WL 7358058, *4 ¶ 22 (Ohio App. 7th Dist. Dec. 26, 2014).

A defendant, in proving accord and satisfaction, typically shows that the plaintiff accepted the defendant's offer to resolve a claim by cashing the defendant's check. *See Toronto 1* at 398-399. But here, Defendant did not send a check; it sent the funds via ACH. *See* ECF No. 38-5 at PageID #: 387; ECF No. 39-1 at 12:1-13:7. Jeswald, Defendant's chief financial officer, admitted that "[w]hen you're sending an ACH to somebody, there's nothing they really do to accept it. . . ." ECF No. 39-1 at 43:18-22. Therefore, even assuming that the November 20, 2023 letter was proposing a release, there was no acceptance by Plaintiff. This alone defeats Defendant's accord and satisfaction defense.

**H. Counterclaims**

Defendant asserts two counterclaims. *See* ECF No. 10. Count I is for negligent misrepresentation. Count II is for breach of contract (pled in the alternative). Because Defendant, as counter-claimant, did not defend its claims in response to Plaintiff's Motion for Partial Summary Judgment (ECF No. 44), the claims are deemed abandoned. *See Little Caesar Enters., Inc. v. Little Caesars ASF Corp.*, No. 17-cv-12329, 2019 WL 12054755, at *3 (E.D.

Mich. March 27, 2019), *aff'd*, 842 Fed.Appx. 955 (6th Cir. 2021) (citing *Brown v. VHS of Mich.*, 545 Fed.Appx. 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.")).

## V. Conclusion

Viewing all facts and reasonable inferences in the light most favorable to the nonmoving party, Defendant's Motion for Summary Judgment (ECF No. 36) is denied. Plaintiff's Motion for Partial Summary Judgment (ECF No. 44) is granted in part and denied in part.

Judgment is entered in favor of Plaintiff and against Defendant on the defense of accord and satisfaction and on Counts I and II of the Counterclaim (ECF No. 10).

IT IS SO ORDERED.

May 13, 2025
Date

*/s/ Benita Y. Pearson*
Benita Y. Pearson
United States District Judge